UNITED STATES of America,
Plaintiff-Appellee,

v.

Boyce MITCHELL, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Nolan Ray WILLIAMSON,
Defendant-Appellant.

Nos. 76–1709, 76–1710.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 1, 1976.

Decided May 20, 1977.

Albert C. Harvey, Memphis, Tenn. (court-appointed), for defendant-appellant in No. 76–1709.

Joe A. Dycus, Asst. Federal Public Defender, Memphis, Tenn., for defendant-appellant in No. 76–1710.

Thomas F. Turley, Jr., U. S. Atty., Larry E. Parrish, Memphis, Tenn., for the United States.

Before PHILLIPS, Chief Judge, McCREE * and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Boyce Mitchell, Nolan Ray Williamson, and Clyde W. Jenkins were charged with conspiracy to possess and distribute controlled substances and to use a communication facility to commit the crime of possessing and distributing drugs in violation of 21 U.S.C. §§ 843, 846. Jenkins was tried and convicted separately. *See United States v. Jenkins,* 525 F.2d 819 (6th Cir. 1975). The indictment charged that the conspiracy continued from February 22, 1972 up to and including February 24, 1972, and alleged ten overt acts.

Proof at the trial was developed primarily through the testimony of one Robert Thurston Davis, who, after having been caught by government agents in possession of stolen securities, agreed to become a paid government informer. With complete government support, Davis moved into Memphis, Tennessee with a lady friend and established himself as a successful under-world figure using the alias of James Bonner. While his wife and family were being cared for by the government outside of Washington, D. C., Davis was furnished a townhouse in Memphis, a salary of $1,000 per month, and the use of an expensive automobile. With his consent, Davis' townhouse was fully equipped with electronic devices and from time to time he was supplied with a body transmitter whereby his conversations could be overheard when he was outside the apartment. Although the conspiracy which was ultimately charged in the indictment related to the possession and distribution of drugs, the initial objective of the mission was to uncover illegal counterfeit money activity.

Davis moved into the Memphis townhouse in January 1972 and immediately set to work establishing contacts by talking with prior acquaintances Boyce Mitchell and Paul "Pep" Patterson. Davis first learned about Williamson when his name was mentioned in a conversation with Mitchell, who indicated that he had had dealings before with him. At Davis' urging, Mitchell endeavored to get in touch with Williamson for the purpose of dealing in counterfeit money, but he proved elusive. In the course of Davis' activities he learned that Patterson could possibly supply certain amphetamines and a number of prescription-type drugs.

On February 10, 1972 Davis and Mitchell made a trip to Patterson's farm near Oxford, Mississippi, ostensibly to obtain an automatic weapon. At that time Davis obtained a list of the drugs from Patterson. Later, Davis, wearing a body transmitter, returned to Patterson's farm to see the drugs and picked up several samples, leaving a $200 deposit as security. These drug samples were turned over to a government agent who instructed Davis to arrange for the purchase of all the drugs that Patterson had shown him. Many telephone conversations ensued, culminating in Davis' agreement to buy the drugs. On February 22,

---

* The Honorable Wade H. McCree, Jr., resigned on March 28, 1977, and did not participate in this opinion.

Patterson delivered them to Davis' apartment in Memphis. On a pre-arranged signal, Patterson was arrested and the drugs were seized and locked up as evidence.[1]

Meanwhile Mitchell was proceeding in his efforts to involve Williamson in the possible purchase of the drugs which Patterson claimed to have for sale. Mitchell was not himself present at the time Patterson was arrested, nor does he appear to have known about it until some time later.

Davis testified that he and Mitchell had developed a partnership arrangement whereby they were to split the profits from deals involving counterfeit money, automatic weapons, stolen securities and drugs. With Mitchell's intercession Davis was finally able to talk with Williamson on February 22, 1972, while the latter was occupying a room in the Quality Courts Motel in Memphis. During the conversations Williamson said, "Mitch said you had a list I would be interested in seeing." They agreed that Williamson would come to Davis' apartment at 11:00 p.m. that night and in fact around 11:30 p.m., Williamson, together with Jenkins and James Thomas Frazier,[2] arrived at the apartment, where their conversations were recorded by the hidden equipment.

The tapes of this conversation form the principal basis for the charges of conspiracy. Williamson appeared to be more interested in counterfeit money than in drugs, but at the same time his two confederates, Frazier and Jenkins, proceeded to evaluate the drugs on the Patterson list and to discuss the possibility of their buying part or all of the collection. At one point Williamson turned the conversation to coke (cocaine) which he mentioned he could procure from California in any quantity that Davis might want. The parties closed their conversation that evening with an informal agreement to get together to negotiate a price on the drugs furnished by Patterson and to establish a continuing relationship

for the sale of cocaine and counterfeit money, both of which Williamson offered to supply through his California sources.

On February 23 Williamson talked by telephone with Davis and advised him that he had called his connection in California concerning cocaine, but it was too early to talk to the people. He also said that he was going to talk to Frazier and Jenkins about the Patterson list of drugs. Again, on February 24, 1972, Davis' girl friend took a telephone call from Williamson, who identified himself and indicated that he wanted Davis to know that "I want to talk business with him." Shortly thereafter the undercover operation ceased, the apartment was closed down, and the indictments issued. The proposed deals in the drugs and counterfeit money never took place.

In their appeals, Mitchell and Williamson raise nineteen variously stated claims of error.

## I. SUFFICIENCY OF THE EVIDENCE

■ Both Mitchell and Williamson challenge the sufficiency of the evidence to show a conspiracy between them and Jenkins. Basically they claim that "Williamson and the others never agreed to do anything with drugs other than to talk about them."

The conspiracy charged in the indictment was of limited duration, February 22 to and including February 24. There is no evidence that Mitchell and Williamson actually met during that period, although, of course, Williamson and Jenkins together visited Davis' townhouse and participated in negotiations there. Mitchell was not present during that crucial meeting on the evening of February 22. Nevertheless we are satisfied that there was sufficient evidence to establish a conspiracy during those days between Mitchell, Williamson and Jenkins. The several telephone calls between the various parties and the testimony of Robert Thurston Davis established the illegal agreement.

---

1. The circumstances are outlined in *United States v. Craig*, 522 F.2d 29 (6th Cir. 1975), involving Craig, the driver of the truck which delivered the drugs to Davis' apartment.

2. Frazier was separately indicted and tried for his part in the incident, and was acquitted.

The meeting at Davis' apartment was the result of a number of telephone calls between Mitchell, Davis and Williamson. Williamson had originally asked Davis to come to his room at the Quality Court Motel. However, in a later call it was agreed that Williamson would come to Davis' townhouse instead. He arrived at approximately 11:30 p.m. in the company of Clyde Jenkins and James Thomas Frazier.

For the next 45 minutes or so Davis, Williamson, Frazier, and Jenkins conversed at length over a wide variety of subjects. Davis produced a copy of the list of drugs which had earlier been supplied by Patterson. A general conversation followed. Frazier and Jenkins were going over the list item by item and discussing its merits and the types of drugs involved, while Davis and Williamson engaged in amenities, it being rather apparent that Williamson was trying to determine Davis' reliability. Although very careful at the beginning, Williamson eventually dropped his guard in increasingly more congenial conversation with Davis concerning prior acquaintances and experiences in other cities. Eventually they moved on to an exploration of the possibility of doing business in counterfeit money, in guns, and in personal identification cards such as draft cards and driver's licenses. Davis indicated to Williamson that he was going to try to set up a warehouse in Memphis. In turn, Williamson cautioned him about involvement in Memphis crime because of the unreliability of police cooperation.[3] The conversation ultimately turned to hard drugs. After probing Williamson as to whether the latter could use any "hard dope or anything," in contrast to the type of drugs acquired from Patterson, Williamson indicated he had no interest in buying any dope. However, the recorded conversation revealed his desire to supply hard drugs:[4]

> "Bonner [Davis]: But I can use some good hard dope . . .
> Williamson: Yeah. You want some uh —smack.

Bonner: Yeah. I want something I can get rid of. This ___, that ___, you're gonna have to get rid of to somebody that can use.

Jenkins: You got to have somebody who's got an outlet for it.

Williamson: Right.

Frazier: This guy, this guy can move it.

Jenkins: That's why, when we just had in mind. When they told us what it was, well we said, well we know a guy that ___ with it and move it.

Bonner: Yeah.

Williamson: You got an outlet for any coke?

Bonner: Yes.

Williamson: That crystal coke.

Bonner: Yes.

Williamson: I can get you all of that that you want, now. That—That, comes from California, too, ya know.

Bonner: Is it cut down pretty good or is it (undiscernible word)

Williamson: No, you get good stuff. I know them people, ya know. They do business right, ah ___"

Thereafter they discussed the price, Williamson stating that the stuff comes high, "$50 a spoon." After a few more reminiscences, they returned to the question of Bonner's buying some dope from Williamson:

> "Williamson: How much of that coke do you think you could use? Say, say, maybe, you know, where it would come in, come in maybe, come in maybe once a week or twice, ah, or twice a month or something like this, you know?
> Bonner: Two keys a month.
> Williamson: Two keys a month?
> Bonner: Yeah. Now look, if it's halfway decent ___, I don't give a damn whether . . . . ..

---

3. Williamson's defense was that he was, at the urging of a Memphis police agent then deceased, present merely to warn Davis against setting up business in Memphis.

4. The gamier expletives in the transcript have been deleted.

Williamson: Naw, ah, ah, it would have to come right. If it don't, you know, then you go back and make it, you know, make it right, ah, ah. I know, I know the people, you know, that's doing the business, and I, you know, I think it will be right.

Bonner: I'm just, I'm just going to wholesale it out. Of course, I can't ___ around and go out and sell it on the street.

Williamson: Naw.

Bonner: I couldn't, I just wouldn't do it.

Williamson: Naw.

Bonner: But ah, if it's halfway decent stuff, you know, everybody'll make a slice, get a good price for it. I can get, get rid of a bunch of it at one time and ah, you know, don't have to worry about getting busted, or  .   . ..

Williamson: Naw.

Bonner: The main problem is, as long as they treat me right. Of course, I'm going to do the same.

Williamson: Well, these people do business on an honorable basis, ah, you know, they do business out there.

Bonner: Like I say, I can sure use it."

While Davis' negotiations for sale of Patterson's drugs were primarily with Jenkins and Frazier, there is little doubt that all of the parties were involved.

"Jenkins: Jimmy, [James Bonner, alias Davis] you got any price on that stuff? You know what them people need for it?

Bonner: Well, the boys is asking six for it. But I think we can get off of that and just get on down and everybody will make a little money.

Jenkins: Well, well, we—we don't want it. But we know a boy who will buy. We'll go see what he'll give, then we'll make y'all an offer so we can make something for moving it.

Bonner: That, that's good enough. That's good enough.

Jenkins: We'll tell you what, ya know, all we want is just to move it cause the boy—we'll, we take care of one another—and he's good boy and ah ____. We'll go

see what he wants to pay for it, and then we will cut you in on it.

Bonner: Good enough!"

Finally the parties concluded their conversation with an agreement that Williamson, Frazier and Jenkins would contact Davis later concerning the possible sale of the Patterson drugs and the furnishing of counterfeit money and cocaine. Williamson agreed to talk to his sources in California concerning both the cocaine and the counterfeit and to inform Davis of the outcome. Williamson did call the next day and told Davis that he had attempted to reach the California people, but it was too early to talk to them. He also said that he would talk to Frazier and Jenkins about the drugs on the list. Finally on February 24, 1972, Williamson placed a call to Davis' townhouse. Though Davis was not present, Williamson nevertheless told his girl friend that he "wanted to talk business with him."

While the dealings of the parties were more fully explained and reinforced by other evidence, much of it admissible hearsay, the foregoing shows that the evidence was altogether sufficient to make the question one for the jury.

## II. HEARSAY

Defendant Williamson raises two claims in regard to the admission of certain hearsay statements. First, he argues that the trial judge erred in refusing to give limiting instructions prior to admitting these statements during the trial. Second, he asserts that the declarations were erroneously admitted as to him, since there was no independent evidence establishing his involvement in a conspiracy with the declarant, a prerequisite to the application of the co-conspirator exception to the hearsay rule.

█ Williamson relies primarily upon *United States v. Lutwak,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), and the following cases, *United States v. Craig,* 522 F.2d 29 (6th Cir. 1975); *United States v. Lucido,* 486 F.2d 868 (6th Cir. 1973); *United States v. Talbot,* 470 F.2d 158 (6th Cir. 1972); *United States v. Honneus,* 508 F.2d

566 (1st Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975), and *United States v. Apollo,* 476 F.2d 156 (5th Cir. 1973). It is apparent, we believe, that Williamson misunderstands the rule regarding the necessity for limiting instructions as it is applied in this circuit. Also we find sufficient evidence in the record, disassociated from the hearsay, to connect him with the conspiracy. At the outset of the trial, there was considerable testimony and evidence in the form of tape recordings of telephone conversations between Davis and Mitchell which contained at least some limited references to Williamson. No timely objection to the admissibility of this evidence appears to have been made by Williamson. When an objection was finally interposed, it was not on the basis that the hearsay was inadmissible as to Williamson because it was not in furtherance of the conspiracy,[5] but rather that the hearsay could not be utilized until the prosecution established independent evidence of both the conspiracy itself and of Williamson's involvement in it.[6]

■ Whatever might be the rule in other circuits, *see e.g. United States v. Apollo, supra; United States v. Honneus, supra,* the rule in the Sixth Circuit is that the preliminary question of admissibility of hearsay testimony, dependent upon the introduction of independent evidence, is a matter for the trial judge and not the jury to decide. *South-East Coal Co. v. Consolidation Coal Co.,* 434 F.2d 767 (6th Cir. 1970), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971). *See United States v. Nixon,* 418 U.S. 683, 701, n.14, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Jones,* 542 F.2d 186, 203 (4th Cir. 1976); *United States v. Kaplan,* 510 F.2d 606, 612 (2d Cir. 1974); *United States v. Allende,* 486 F.2d 1351, 1353, n.6 (9th Cir. 1973), *cert. denied,* 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974); *United States v. Carbo,* 314 F.2d 718, 737 (9th Cir. 1963). While the trial court also submitted the issue to the jury here, in *United States v. Hoffa,* 349 F.2d 20, 41 (6th Cir. 1965), *aff'd* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), we observed that the submission of the question of the hearsay admissibility to the jury instead of its conclusive determination by the judge was more favorable to the defendants than required.

■ Likewise, we have frequently held that the conditional admission of hearsay testimony subject to the production of independent proof is within the discretion of the trial judge. *United States v. Mayes,* 512 F.2d 637, 651 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975); *South-East Coal Co. v. Consolidation Coal, supra,* 434 F.2d at 788.

---

5. For example when Williamson's counsel first objected to the hearsay, he stated:

Your Honor, at this time with regard to Mr. Williamson, I object to a move to strike (sic) the testimony of Mr. Davis and the same with regard to the telephone conversation between Davis and Mr. Mitchell where he talked about the list and what Mr. Mitchell says about Mr. Williamson on the grounds that there is no proof of conspiracy to this point | between Mr. Williamson and Mr. Mitchell.

(Trial Transcript pp. 559–560)

He continued:

Would Your Honor make any instruction to the jury that they can't consider those remarks by this witness and what came in on the tape unless they felt that the Government has established a conspiracy concerning the statements of their meeting.

(Trial Transcript p. 560)

6. The alleged dates of the conspiracy as set forth in the indictment are limited to the period of February 22–24, 1972. Because no objection was made on the basis of the time during which the hearsay declarations were made, either in the trial court or on this appeal, we need not consider the interesting question of whether they might nevertheless have been admissible on the basis that the conspiracy itself as shown by that evidence had existed for sometime previous to February 22.

It is clear that declarations not made in furtherance of the conspiracy, as when uttered after the conspiracy had ended, are inadmissible as to all but the declarant. *Lutwak v. United States,* 344 U.S. 604, 618, 73 S.Ct. 481, 97 L.Ed. 593 (1953). The declarant can no longer be considered an agent of the other conspirators then. *Id.* at 617, 73 S.Ct. 481.

The scope of the conspiracy alleged in the indictment does not limit the application of the co-conspirator exception. In fact the exception can be used even though the indictment does not charge a conspiracy. *United States v. Jones,* 542 F.2d 186, 202 n.31 (4th Cir. 1976).

■ The defendants were tried on only one count and that pertained to the alleged conspiracy. There were no substantive offenses for the jury to consider at the same time. There did not exist the possibility, as in *United States v. Craig, supra,* that a defendant not shown to have been linked to the conspiracy might nevertheless be held guilty of a substantive count through the improper consideration of hearsay evidence. Nor would a danger exist, as in *United States v. Mayes, supra,* that the jury would have difficulty in separating the evidence as to each of a large number of defendants. Therefore, we conceive the issue to be the propriety of the court's determination that there was independent or disassociated evidence of the conspiracy and of Mitchell's and Williamson's involvement in it. If the proofs contain such evidence then the declarations by Mitchell made in furtherance of the conspiracy were properly admitted against Williamson and there was no need to caution the jury. We conclude there was ample evidence in the direct proof of Williamson's own statements made to Davis during the February 22 meeting and to Davis' girlfriend over the telephone. As we held in *Mayes, supra,* 512 F.2d at 651, the independent evidence needed to establish a preliminary case of conspiracy is:

> [L]ess than proof beyond a reasonable doubt; indeed it is less than a preponderance. *South-East Coal, supra,* 434 F.2d at 779. Moreover the prima facie case need not be established before the proffered hearsay may be admitted; the judge may admit it conditionally. It is sufficient if at the close of the government's proofs, a prima facie case of the conspiracy and the defendant's connection with it has been established by "independent or disassociated evidence." *South-East Coal, supra,* at 788.

It is true, of course, that the evidence at the trial at no time directly shows communications between Mitchell, Williamson, and Jenkins. We believe, however, that it was proper for the trial judge to consider the tape recordings between Mitchell and Davis in making a threshold determination of whether there was independent evidence of the conspiracy as to Mitchell, the declarant, although we would agree that this would not be independent evidence of Williamson's involvement. We think at least one of the purposes of the rule requiring independent evidence of an individual conspirator's involvement is to avoid the real danger that by the abuse of hearsay testimony, an individual can be allegedly involved in a conspiracy about which he has no knowledge and is powerless to defend himself without giving up his privilege against self-incrimination. Such a danger is avoided here by direct proof of Williamson's arrival at Davis' apartment shortly after the seizure of a quantity of illegal drugs and by tape recordings of Williamson's own statements acknowledging a relationship with Mitchell and showing his participation in the conspiracy, and his relationship with co-conspirator Jenkins.

## III.  FAILURE TO EXCUSE JUROR FOR CAUSE

■ Mitchell, in his appeal, claims that the district judge committed reversible error in failing to excuse, upon Mitchell's challenge for cause juror Bernie R. J. Ray. According to the practice of the district court, voir dire of prospective jurors is conducted by the trial judge, although counsel may request that the judge ask a juror particular questions. It developed on the voir dire of Mr. Ray that two years before the trial he had retired from duty with the Memphis Police Department where he had engaged in "detective work and uniform." Ray denied, however, that he had ever been assigned as a liaison officer with federal law enforcement offices. He admitted being acquainted with Lt. Talley of the Memphis Police Department who was expected to and did in fact testify in the trial. However, upon further inquiry, juror Ray answered that he was satisfied that he could be fair and impartial and decide the case on the evidence "and not [on] some prior experience [he] had in any way." Nor was there anything, the juror stated, about his relationship with Lt. Talley which would endanger his impartiality.

Mitchell claims prejudicial error resulted because he was forced to exhaust his peremptory challenges to unseat Ray, and was thereby prevented from peremptorily challenging another juror who eventually was seated and became foreman.

While it would have been the better practice to have excused juror Ray under the circumstances, we are unable to hold that the failure to do so was such an abuse of discretion as to warrant the reversal of Mitchell's conviction. Neither personal knowledge by Ray of appellant's case nor any prejudice by Ray was disclosed. Ray was not at the time of the trial a member of the police department. In any event, "the mere fact of membership on a police force is not presumptively a disqualification for service on a jury in a criminal trial." *Mikus v. United States*, 433 F.2d 719, 724 (2d Cir. 1970). If there was any other basis for probing into Ray's objectivity, counsel did not seek to pursue it. To reverse a trial judge on these facts would severely limit the broad discretion that traditionally is accorded a district judge in this area. *United States v. Grant*, 494 F.2d 120, 123 (2d Cir. 1974), *cert. denied*, 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 79.

## IV. INTERJECTION OF INADMISSIBLE TESTIMONY

■ On direct examination, Agent Parks testified that in arresting Mitchell, he had found a pistol in the trunk of Mitchell's car. While we have not been asked to determine whether the search of the trunk and seizure of the pistol were unlawful, it does appear that there had been an agreement between counsel and the court that the pistol would not be offered in evidence in the case. Mitchell's counsel moved for a mistrial. The court overruled the motion, explaining that "I just believe that it doesn't justify a mistrial in the total situation." An examination of the transcript reveals that Parks' testimony was not responsive to the government's question.

Volunteered testimony by a government agent about a defendant's suspected complicity in another and wholly unrelated crime may require reversal of that defendant's conviction. *United States v. Blanton*, 520 F.2d 907 (6th Cir. 1975). In *United States v. Wiley*, 534 F.2d 659 (6th Cir. 1976), Wiley's conviction was reversed and the case remanded for new trial where inadmissible evidence suggesting Wiley's complicity in other unrelated crimes was injected into the trial. Whether such conduct requires reversal or can be held harmless within the meaning of Federal Rules of Criminal Procedure, Rule 52(a), must depend upon all of the circumstances in the case at hand. We agree with the trial judge that the totality of the facts in the instant case did not justify the declaration of mistrial.

Assuming, without deciding, that the gun was unlawfully seized from the trunk of the defendant's car at the time of his arrest and that, therefore, testimony of its presence was inadmissible, the error must be conceived to be totally harmless. It was not shown to belong to Mitchell nor did it play any part in the case otherwise. While we are not prepared to characterize the error as an innocent mistake by the agent, the testimony nevertheless was not responsive to the prosecutor's question. The incident was isolated and the trial judge offered to give curative instructions to the jury. In view of the overwhelming evidence against Mitchell, the reference to the pistol, if an error at all, was harmless beyond a reasonable doubt.

## V. DAVIS' FEAR FOR HIS SAFETY

■ Williamson argues that the trial court erred in permitting the government to elicit testimony from Davis that Davis' life would be endangered should he be incarcerated. The suggested inference was that Williamson was a highly dangerous criminal who would seek revenge against an informant.

Normally, the introduction of such evidence is, in our judgment, error in the absence of any justification or support in the record. *United States v. Peak*, 498 F.2d 1337 (6th Cir. 1974). However, upon the record here, we do not consider the inquiry prejudicial.

Counsel for both Mitchell and Williamson went to great lengths to challenge the credibility of Davis and particularly his motivation as a government informer. They not only established his prior criminal background, but they explored in detail the agreements Davis had secured from the government for the protection and care of himself and his family. Under the circumstances, we cannot find that it was an abuse of discretion for the judge to have permitted further questioning of Davis on re-direct examination to show that many of the arrangements were conceived not so much from a desire to reward Davis for his cooperation as to protect him and his family against retribution. Because Davis' testimony sought to rebut the opposite inference which defense counsel had suggested on cross-examination, we hold that in the context here the testimony was not improper.

## VI. FINAL ARGUMENT

■ Counsel for both Williamson and Mitchell complain that the Assistant United States Attorney, Mr. Parrish, exceeded the bounds of proper closing argument in referring to Davis' cooperation with the government and the threats upon his life. There is ample testimony in the record indicating that Boyce Mitchell had indeed planned to kill Davis in order to prevent him from testifying. None of this testimony, however, appears to have implicated Williamson; and in fact, the government expressly conceded before the jury during the course of trial that the proof of the plot to kill Davis only implicated Mitchell.

After noting that Davis had been under close surveillance by the government, the Assistant United States Attorney made the following comments in his closing argument:

"I would suggest, further, as far as him living in real life, for the past two years Mr. Davis—how would you like to have testified against a man like Mr. Williamson or the several others that he has? He lives under a constant threat for the rest of his life. He is not getting any money from the federal government at this point.

Mr. Dycus: Excuse me. I object to Mr. Parrish indicating Mr. Williamson in any way has ever threatened Mr. Davis. It is outside the record, there is no proof of it, it is prejudicial.

The Court: Well, the jury can only consider that in the light of the proof. And if they find there isn't any proof they can ignore it. If there is some substance to it based on the proof then they may consider it.

Mr. Parrish: The comment was made how would they like to live having testified against just anybody to the degree that you were able to observe the personality of Mr. Williamson, through the tape, and everything, how would you like to live having testified against him.

Mr. Dycus: (Slamming papers down on table) Excuse me, Your Honor, I think that's improper and—

The Court: Mr. Dycus, I consider the Court just overruled it. And, furthermore, the record should reflect that you slammed some papers down when you stood up, and that's not the proper way to address the Court.

Mr. Parrish rephrased in light of the Court's observation, and they may consider a lot of testimony about snitches and everything else, and I don't think you get to interrupt him when he rephrases in light of the ruling. And particularly when you slap the papers down like that.

Mr. Dycus: I'm sorry, Your Honor.

Mr. Parrish: How would you like to live under twenty-four hour surveillance twenty-four hours a day and go into work under surveillance to do with Mr. Williamson or Mr. Mitchell or whoever it is, exposing yourself to a certain amount of hazardous activity just to engage in that sort of situation. And he still has to face the indictment in this case of the bombing.

No promise has been made to Mr. Davis at all. Surely he hopes he will not have to go to prison; surely his help in these things will mitigate the sentence he gets; but he has to stand before a Judge and be

sentenced, and there is a risk in that, particularly if he had to go back to the penitentiary having done what he has done.

So Mr. Davis has himself in a position that none of us can appreciate."

Because neither the United States Attorney nor the district court specifically excluded from the jury's consideration the inference that Williamson had plotted against Davis, Williamson claims that he was unduly prejudiced by the very damaging evidence which did exist against Boyce Mitchell.

We do not hesitate to observe that the argument quoted in our judgment skirts, if it does not exceed, the outer bounds of proper advocacy.

We believe, however, that, considered in its context, the possibility that the jury might have inferred that Williamson was a participant in the plot by Mitchell to kill Davis was highly unlikely. The circumstances of that plot neither involved nor remotely implicated Williamson and the proofs indicate that it would have been highly unlikely for Mitchell and Williamson to have conspired together at that time. As we held in the appeal of another conviction of Boyce Mitchell, we find no prejudice because "a jury could be expected to segregate such evidence and apply it only to Mitchell." *See, United States v. Franks*, 511 F.2d 25, 30 (6th Cir. 1975), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693.

## VII. THE CONTEMPT CHARGES

Six months after Mitchell and Williamson were indicted for the instant offense, the government moved to require them to submit voice exemplars, stating by affidavit that they were needed to positively identify the voices of the defendants as recorded on certain tapes to be introduced at trial. While there was some independent proof that the recorded voices were those of the defendants, the government asserted that further corroboration was needed.

Following a show cause hearing, the court issued an order on October 31, 1972 directing the defendants to give the exemplars as requested. The defendants refused. Following two hearings in open court, in which the defendants gave their reasons for opposing the order and adhered to their position of noncompliance, the court ordered that they were to be found in civil contempt. The district judge noted that "they would have the key to the jailhouse door, so to speak, that is to say they would have the power to remove the contempt at any time, it would not be a punishment for past acts." Earlier the district judge had made it clear that each defendant would receive no credit against federal criminal sentences for the jail time accruing while he was incarcerated for contempt of court. Prior to the citation of contempt, Williamson had already been imprisoned for failure to make bond and Mitchell was being held without bond.

On November 25, 1974 Williamson finally gave his voice exemplar, thereby ending his civil contempt. On the same day the district court set this case for trial and subsequently determined that as to Mitchell the contempt would also end on November 25. Thus each defendant was in contempt of court from December 22, 1972 to November 25, 1974, a period of approximately 23 months.

Upon conviction, Boyce Mitchell was given a five-year indeterminate sentence and Williamson was given a ten-year indeterminate sentence, both under former 18 U.S.C. § 4208(a)(2). The judgment and commitment in each instance specifically provided:

It appearing to the court that the defendant was held in contempt of Court from December 22, 1972 through November 25, 1974, therefore, it is Ordered that the defendant is not to be given credit officially or unofficially for time of service while held in contempt of court.

For several reasons the defendants assert that the trial judge improperly excluded those 23 months from the preconviction jail-time to be credited toward service of the sentences imposed.

## A.

Defendant Mitchell contends that the contempt order is invalid because the underlying order compelling the production of the voice exemplars violated his constitutional right to be free from unreasonable searches and seizures and his constitutional privilege against self-incrimination. Mitchell raised the same issue in *United States v. Franks*, 511 F.2d 25, 32 (6th Cir. 1975) *cert. denied*, 422 U.S. 1042, 1048, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975), an appeal from a separate conviction. We reject it here for the same reasons.

In *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), the Supreme Court held that a witness subpoenaed to appear before a grand jury could be compelled to produce an exemplar of his voice without violating the Fifth Amendment privilege against compulsory incrimination. Nor would such a compulsory voiceprint, even of the same words used in the alleged crime, constitute a "seizure" within the meaning of the Fourth Amendment. Mitchell also urges that *Dionisio* should be limited to the context of grand jury proceedings. We likewise reject this claim for the reasons set forth in *United States v. Franks, supra*, 511 F.2d at 32. *Accord, United States v. Woods*, 544 F.2d 242, 263 (6th Cir. 1976).[7]

## B.

Defendant Mitchell further argues that even if the contempt order was valid,

18 U.S.C. § 3568[8] required that he be given credit against his sentence for the period of confinement during his civil contempt. He urges a literal reading of the statute by contending that his incarceration was "in connection" with the conspiracy offense for which the sentence was imposed. However, it suffices to respond that the confinement was imposed in connection with the civil contempt and not in connection with the criminal offense of conspiracy. *See Williamson v. Saxbe*, 513 F.2d 1309 (6th Cir. 1975); *Martin v. United States*, 517 F.2d 906, 909 (8th Cir.), *cert. denied*, 423 U.S. 856, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975); *Anglin v. Johnston*, 504 F.2d 1165 (7th Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1353, 43 L.Ed.2d 440 (1975). *Cf. In re Grand Jury Investigation*, 542 F.2d 166 (3rd Cir. 1976).

## C.

Mitchell and Williamson contend that the issuance of the contempt order itself was unlawful, an issue that poses more difficulty. First, they claim that the procedures followed by the district judge violated their Fifth Amendment right to due process and Sixth Amendment right to a jury trial. Second, they argue that the statute cited by the district court, 18 U.S.C. § 401, related only to criminal contempt and that the recalcitrant witness statute, 28 U.S.C. § 1826, limited the period of confinement to 18 months.

7. Mitchell also claims that the district court erred in allowing the prosecution to introduce evidence of his civil contempt for failure to give the voice exemplar. We note that the jury was never actually apprised of the fact that Mitchell had been held in contempt, although there was a brief mention of the refusal to give a voice exemplar. This testimony was proper. *United States v. Franks, supra*, 511 F.2d at 36.

8. § 3568. *Effective date of sentence; credit for time in custody prior to the imposition of sentence*

The sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence. The Attorney General shall give any such person credit toward service of his sentence for any days spent in custody in connection with the offense or acts for which sentence was imposed. As used in this section, the term "offense" means any criminal offense, other than an offense triable by court-martial, military commission, provost court, or other military tribunal, which is in violation of an Act of Congress and is triable in any court established by Act of Congress.

If any such person shall be committed to a jail or other place of detention to await transportation to the place at which his sentence is to be served, his sentence shall commence to run from the date on which he is received at such jail or other place of detention.

No sentence shall prescribe any other method of computing the term.

■ The precise procedures required by due process for a finding of civil, rather than criminal contempt, are somewhat unclear. *Consolidation Coal Co. v. United Mine Workers*, 514 F.2d 763 (6th Cir. 1975). Williamson claims the trial judge failed to inform him that he would receive no credit for the jail-time served while in contempt, and he objects to the lack of an opportunity to suggest the sanctions for his contempt. This argument is without merit since we conclude that the defendants were accorded due process by adequate notice of the contemptuous acts and the consequences of the contempt order, and by an opportunity to present their reasons for not complying with the exemplar order. *See Consolidation Coal Co., supra*, 514 F.2d at 765; *Fisher v. Marubeni Cotton Corp.*, 526 F.2d 1338, 1343 (8th Cir. 1975).

Appellant Mitchell claims that the contempt order was in the nature of a criminal contempt and he was therefore denied his right to a jury trial under *Codispoti v. Pennsylvania*, 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974). He reasons that since he was already in jail at the time of the contempt, the court's order could not be coercive because his compliance with it would not have resulted in his release. Thus, he urges that the imprisonment, which exceeded six months, could only be imposed after a jury trial. This argument is without merit.

■ In determining whether contempt proceedings are civil or criminal in nature, the proper focus is "the character and purpose" of the action. *Shillitani v. United States*, 384 U.S. 364, 369, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1969); *Consolidation Coal Co. v. United Mine Workers, supra*, 514 F.2d at 765. While any period of imprisonment has punitive and deterrent effects, the order here must still be viewed as remedial or coercive because it conditioned appellants' release from confinement, on the contempt charges, upon willingness to comply with the underlying command of the court. No fixed term of imprisonment was established and as the Supreme Court stated in *Shillitani v. United States, supra*, 384 U.S. at 368, 86 S.Ct. at:

> When the petitioners carry "the keys of their prison in their own pockets," *In re Nevitt*, 117 F.2d 448, 461 (C.A. 8th Cir. 1902), the action "is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees." *Green v. United States*, 356 U.S. 165, 197, 78 S.Ct. 632, 650, 2 L.Ed.2d 672 (1958) (Black, J., dissenting).

The coercive nature of the confinement was rendered especially effective by the trial judge's admonition that the confinement for contempt would not be credited against a sentence which might be imposed for the conspiracy offense. Since the contempt was therefore civil in nature, it carried with it no right to a jury trial. *Cheff v. Schnackenberg*, 384 U.S. 373, 377, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966); *Shillitani, supra*, 384 U.S. at 365, 86 S.Ct. 1531; *Douglass v. First National Realty Corp.*, 177 U.S. App.D.C. 409, 543 F.2d 894, 897 (1976).

The order citing the defendants for contempt recited that the court was "acting on the authority and power vested in this court by Title 18, United States Code, Section 401(3)." No reference was made in the order to the more recently enacted 28 U.S.C. § 1826, which deals with civil contempt for certain specific acts. The defendants argue § 401[9] concerns criminal contempt only and that § 1826 was the proper source of authority. Thus, they reason that the contempt order was totally invalid or

---

**9.** § 401. *Power of court*

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command. June 25, 1948, c. 645, 62 Stat. 701.

alternatively that it was subject to the 18-month limitation in the latter section.

The source of authority for civil contempt sanctions is the "inherent power" of courts to enforce compliance with their lawful orders. *Shillitani, supra,* 384 U.S. at 370, 86 S.Ct. 1531; *Lambert v. State of Montana,* 545 F.2d 87, 88 (9th Cir. 1976); *In re Long Visitor,* 523 F.2d 443, 448 (8th Cir. 1975). This power has been recognized by Congress in 18 U.S.C. § 401 and its antecedents beginning with § 17 of the Judiciary Act of 1789, 1 Stat. 73, 83. *United States v. United Mine Workers,* 330 U.S. 258, 331, 67 S.Ct. 677, 91 L.Ed. 884 (1947) (Black and Douglas, JJ., concurring in part and dissenting in part). While section 401 was a "congressional step to curtail the contempt powers of the federal courts," *Green v. United States,* 356 U.S. 165, 171, 78 S.Ct. 632, 636, 2 L.Ed.2d 672 (1958), the appellants cite no authority to support a conclusion that it totally eliminated the use of civil contempt, and in fact the case law indicates the opposite. *See Shillitani, supra,* 384 U.S. at 370, 86 S.Ct. 1531.

█ The only serious question, therefore, is whether the enactment of 28 U.S.C. § 1826 and particularly the 18-month limit contained in subsection (a)(2) restricted the power of the district judge to punish Williamson and Mitchell for their refusal to obey the court's order to give voice exemplars. We conclude it does. Section 1826 was enacted as Title III of the Organized Crime Control Act of 1970, Pub.L.No.91-452, 84 Stat. 922, and provides in part:

§ 1826. *Recalcitrant witnesses*

(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of

(1) the proceeding, or

(2) the term of the grand jury, including extensions, before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

The legislative history of the recalcitrant witness portion of the Act is of minimal value, although it is clear that Title III related to the power of federal courts to use civil contempt sanctions. House Report No. 91-1549 (Sept. 30, 1970), reported in 1970 U.S.Code, Cong. & Ad.News, pp. 4007, 4022. Justice Rehnquist, dissenting in *Gelbard v. United States,* 408 U.S. 41, 73, 92 S.Ct. 2357, 2374, 33 L.Ed.2d 179 (1972), observed:

[T]he Senate Report states that it was intended to codify the "present practice" of the federal courts. S.Rep. No. 91-617, p. 148 (1969). The existing practice of the federal courts prior to the enactment of this section was based on Fed.Rule Crim.Proc. 42 and on 18 U.S.C. § 401, both of which dealt generally with the power of courts to punish for contempt. The enactment of § 1826(a) appears to have resulted from a desire on the part of Congress to treat separately from the general contempt power of courts their authority to deal with recalcitrant witnesses in court or grand jury proceedings.

The government argues that since Section 1826 expressly refers to "witnesses," it is inapplicable where, as here, "defendants" disobey a court order. Nevertheless, we think it was enacted by Congress to apply to all instances of the specific conduct described therein. There seems to be no serious question that the failure of the defendants to obey the court order to give voice exemplars was a refusal "to comply with an order of the court . . . to testify or provide other information . . . ." The defendants were in fact acting as "witnesses" when directed to produce the information, even though the non-testimonial nature of the evidence makes Fifth Amendment protections inapplicable.

Before the enactment of this statute, there was no limitation on the length of confinement for civil contempt, as long as it retained its coercive character and the defendant had the power to purge himself by compliance with the underlying order. The practical limitation on the civil contempt power in grand jury proceedings, however, was necessarily imposed by the duration of the proceedings themselves, because "where the grand jury has been finally discharged, a contumacious witness can no longer be confined since he then has no further opportunity to purge himself of contempt." *Shillitani v. United States, supra,* 384 U.S. at 371, 86 S.Ct. at 1536.

As we interpret this statute Congress imposed an 18-month maximum on the length of confinement for civil contempt relating to either a court or grand jury proceeding. We are furnished no authority or reason for requiring a different rule for a defendant than for any other person who is ordered to produce evidence.[10] Thus we find that the civil contempt was invalid to the extent it exceeded 18 months, which period must be credited against the defendants' sentences.

Numerous other assignments of error have been made by both defendants, all of which we have carefully considered on the record in the case, but we find them without merit.

Accordingly the sentences of the defendants will be vacated and the cause remanded for resentencing consistent herewith. The judgment of conviction is in all other respects affirmed.

---

**10.** The government has not claimed that the 18-month rule applies only to grand jury proceedings, and the House Report of the amendment makes no such distinction:

As amended by the committee confinement is, therefore, limited to the life of the court proceeding or the term (including extensions) of the grand jury before which such refusal to comply with the court order occurred, but in no event shall confinement exceed 18 months.

House Report No. 91–1549 (Sept. 30, 1970), reported in 1970 U.S.Code, Cong. & Ad.News, pp. 4007, 4022.