**In re Grand Jury Proceedings Witness Edward Donald ANDREWS.**

**Misc. No. 77–346.**

United States District Court, E. D. Michigan, S. D.

April 3, 1979.

Steven W. Reifman, Deputy Defender, Detroit, Mich., for petitioner.

James K. Robinson, U. S. Atty., and John Newcomer, Detroit, Mich., for respondent.

## FACTS OF THE CASE

FEIKENS, District Judge.

In September of 1977 Andrews was subpoenaed to testify before a special grand jury sitting in this District. He refused, and upon application by the United States Attorney I issued an Order granting him immunity pursuant to 18 U.S.C. §§ 6002 and 6003 and compelling him to testify. Andrews persisted in his refusal, and on October 12, 1977 I adjudged him in contempt and placed him in the custody of the United States Marshal "until such time as he complies with the Order [to testify]." At that time Andrews was serving a state sentence for possession of burglars' tools, M.C.L.A. § 750.116, and I ordered the contempt sentence to be served concurrently with the state sentence.[1]

Andrews remained in the State's custody until November 29, 1978 when that state sentence expired. He was immediately placed in the custody of the U.S. Marshal to continue his contempt sentence directly. He remained in Federal custody until December 22, 1978 when he was released upon application of the Government because the special grand jury before which he was to testify had ceased to sit. 28 U.S.C. § 1826.

Andrews was at liberty until January 3, 1979. On that day he was subpoenaed to testify before a newly empanelled grand jury regarding the same matters to which he had already refused to testify. Andrews again refused. I thereupon granted a second order of immunity and once again ordered him to testify. Upon his refusal, I adjudged him in contempt and remitted him to the custody of the U.S. Marshal until such time as he chose to testify, but in no event was his custody to exceed the life of the grand jury or eighteen (18) months. The witness is currently incarcerated pursuant to my January 3 order.

## THE PROCEDURAL BACKGROUND OF THE CASE

On January 11 Andrews filed a motion to vacate the January 3 order on double jeopardy grounds and, in the alternative, to modify the order to provide that in no event should he be kept in custody after April 23, 1979 since on that date he claims he will have spent eighteen (18) months in custody for his refusal to testify on one subject.

To give the Government adequate time to respond and due to the press of court business, a hearing was set for February 20. (The Government responded on February 16.) At that hearing Andrews' attorney, Steven Reifman, urged two points: double jeopardy and a limit of eighteen (18) months incarceration as to any contempt sentence. He also indicated that he felt compelled to appeal my January 3 order before March 2, and he expressed a desire for a ruling from me by then. I stated that I would deny the motion in its double jeopardy aspect, but that I desired further briefs on the eighteen (18)-month issue, the briefs to be filed within one week (by February 27). No further briefs were filed, both counsel indicating informally that they had been unable to locate further relevant cases or other authority. (I did supply both parties with material from the legislative history which my own research had disclosed.) On March 2 a notice of appeal was docketed in the United States Court of Appeals for the Sixth Circuit.

The point in discussing the procedural history of this case is two-fold. First, it lays out what has transpired so far and, second, it responds to one of the points raised in the Order of Mandamus issued on March 28, 1979 (that the motion to vacate the contempt had been under advisement "for over two months.")

■ Under local practice, a motion is not "taken under advisement" until the parties have been heard and all briefs have been

---

1. Under *In re Liberatore*, 574 F.2d 78, 84–90 (2nd Cir. 1978), I lack the power to interrupt a state sentence for federal contempt incarceration. A contrary result obtains with respect to pre-existing federal sentences. *Id.*, at 84, citing cases.

received. This did not occur until February 27. On March 2 the appeal was filed which in my opinion effectively removed the case from my consideration.[2] Thus, the instant matter was under advisement for about three days. Considering the requirement in § 1826(b) that the appeal be decided in thirty (30) days, I did not expect to receive the case for decision until after such further proceedings as the Court of Appeals may have determined after addressing the substantive issues at hand.

In any event, the issues raised in the February 20 hearing must now be decided.

### THE DOUBLE JEOPARDY ISSUE

[2] Turning to the double jeopardy claim, I reject it. It does not offend the Constitution to imprison a person twice for refusing to answer questions as to the same subject matter before two successive grand juries. This is because the confinement is civil in character, meant to coerce the witness, rather than criminal. *Shillitani v. United States*, 384 U.S. 364, 368, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1969); *United States v. Mitchell*, 556 F.2d 371, 383 (6th Cir. 1977); *United States v. Alter*, 482 F.2d 1016, 1021 (9th Cir. 1973); *United States v. Duncan,*

456 F.2d 1401, 1406–7 (9th Cir. 1972) *vacated*, 409 U.S. 814, 93 S.Ct. 161, 34 L.Ed.2d 72 (1972); H.R.Rep.No.91–1549, 91st Cong., 2nd Sess. 46 (1970) *reprinted in* [1970] *U.S. Code Cong. & Admin.News*, pp. 4007, 4022. S.Rep.No.91–617, 91st Cong., 1st Sess. 148 (1969), *reprinted in* [1970] *U.S.Code Cong. & Admin.News*, p. 4007.

### THE 18–MONTH LIMITATION

The weightier issue concerns the meaning to be attached to that portion of § 1826(a) which reads:

"Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—

"(1) the court proceeding, or

"(2) the term of the grand jury, including extensions,

2. The question whether the notice of appeal actually divested this court of jurisdiction raises a host of thorny procedural questions. The general rule is that perfection of an appeal divests the trial court of jurisdiction. 9 *Moore's Federal* Practice ¶ 203.11, n.6 and accompanying text; 4 Am.Jur.2d, Appeal and Error, § 352; *Berman v. United States*, 302 U.S. 211, 214, 58 S.Ct. 164, 82 L.Ed. 204 (1937) (Notice of appeal after sentence divested court of jurisdiction); *Sykes v. United States*, 392 F.2d 735, 738 (8th Cir. 1968). This rule seems to be subject to two exceptions. The first is when the appeal is not taken from a "final order" under 28 U.S.C. § 1291. *Sykes, supra*, at 738; 9 Moore's, *supra*, at p. 736. Assuming that Andrews received a "final order" on January 3, *Berman v. United States, supra, In re Vericker*, 446 F.2d 244 (2d Cir. 1971); *United States v. Reynolds*, 449 F.2d 1347 (9th Cir. 1971), *cert. denied* 408 U.S. 924, 92 S.Ct. 2500, 33 L.Ed.2d 336 (1972); *In re Murphy*, 560 F.2d 326, 332–3 and n. 10 (8th Cir. 1977); *In re Manufacturers Trading Corp.*, 194 F.2d 948, 955 (6th Cir. 1952); 9 *Moore's, supra*, at ¶ 110.-13[4], then the March 2 appeal divested this court of jurisdiction. However, the question is

further complicated by the second possibility, that though there was a final order on January 3, the January 11 motion to vacate and modify rendered it non-final, and thus the appeal did not divest me of jurisdiction. *United States v. Crescent*, 323 U.S. 173, 177–8, 65 S.Ct. 254, 89 L.Ed. 160 (1944) and *Leishman v. Associated Electric Co.*, 318 U.S. 203, 205, 63 S.Ct. 543, 87 L.Ed. 714 (1942) seem to support this. But there is also authority that an appeal taken when a Rule 59 F.R.C.P. motion is pending does divest the district court of jurisdiction when the case is such as to require a Rule 54(b) certification. 9 *Moore's, supra*, ¶ 203.11 at p. 737, nn. 15 and 16 and accompanying text. However, this determination seems to depend on whether the January 3 order "disposed of fewer than all claims" presented. *Id.* It was for these reasons that I opted to follow the reasoning in *Ruby v. Sec'y of the U. S. Navy*, 365 F.2d 385, 389 (9th Cir. 1966) where the court said "[i]f the district court is in doubt as to whether the notice of appeal is inoperative by reason of some [above referenced] defect, it may decline to act further until the appellee obtains dismissal of the appeal in the court of appeals." Neither party briefed these issues.

before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months."

The Government argues that the eighteen (18)-month limitation is transactional and that with each successive grand jury a new eighteen (18)-month period of incarceration is authorized. Andrews disagrees, and says that the eighteen (18)-month limit sets a ceiling on the total amount of time he may be in custody for refusing to testify as to one subject, regardless of the number of grand juries involved. Neither party cites a case directly on point, and I have found none.

## LEGISLATIVE HISTORY OF § 1826(a)

On January 15, 1969, Senate Bill No. 30 was introduced by Senator McClellan as the Organized Crime Control Act of 1969. 115 Cong.Rec. 827 (1969). Section 102 of Title I contained a proposal for the creation of "special" grand juries, whose ordinary term would be eighteen (18) months, but which could be extended to thirty-six (36) months. Section 301 of Title III was the precursor of the present § 1826. It provided that witnesses who refused to testify before either a court or a grand jury could be summarily confined "until such time as the witness is willing to give such testimony." 115 Cong. Rec. 829 (1969). There was no limitation on the time the witness could be confined, although Senator McClellan thought that because the bill codified the common law of civil contempt, the confinement would be limited to the life of the grand jury. 115 Cong.Rec. 5879–80 (1969).

S. 30 was then sent to the Subcommittee on Criminal Laws and Procedures of the Senate Judiciary Committee for hearings which were held in the spring and early summer of 1969. See H.R.Rep.No.91–1549, *supra*, at 37. Two major concerns pertinent to this discussion emerged. Several commentators thought that the lack of any time limit on the witness' incarceration would subject Title III to constitutional attack. *Hearings Before the Subcommittee on Criminal Laws and Procedures of the Committee on the Judiciary on the Organized Crime Control Act of 1969*, United States Senate, 91st Cong., 1st Sess. 352 (remarks of Frank Hogan) (hereafter *Hearings* at "_____"). The Department of Justice recommended that since the bill was to restate the common law, the incarceration should be limited to the life of the grand jury. *Hearings*, at 370–1; *Hearings*, at 379 (remarks of Assistant Attorney General Will Wilson). *See also*, S.Rep.No.91–617, *supra*, at 108.

Later commentators believed this limitation an improvement on the original language, but noted that an infirmity in Title III remained. That defect arose from the juxtaposition of Titles I and III which, due to the extension of the term of the grand jury from eighteen (18) to thirty-six (36) months, meant that a witness could spend up to three years in jail for refusing to testify.

Lawrence Spieser, Director of the Washington, D.C. office of the A.C.L.U. asserted:

"Moreover, Title I of the bill extends the potential life-time of a grand jury from the traditional 18 months to up to 36 months. If Title III is intended to limit confinement for the life of the grand jury, as a result of Title I, it would authorize confinement without possibility of bail for as long as 3 years—double the length of time now permitted. This is inconsistent with the accepted rationale for the court's summary civil contempt power, which has been long allowed on the theory that the confinement is coercive, not punitive, and that contemnor holds 'the keys of the prison in his own pocket.' *In Re Nevitt*, 117 F. 448, 461 (8th Cir. 1902). It is to be contrasted with the court's power to imprison for criminal contempt. Since that is viewed as punishment, confinement is limited to 6 months unless a jury trial on the contempt charge is provided. *See Frank v. United States*, 37 L.W. 4437 (May 20, 1969). Where a witness is subjected to a 3 year confinement and is willing to suffer that, rather than testify, it becomes clear that the coercion is inadequate, as in

the case of a mobster who, though imprisoned for years, refuses to testify for fear of torture and death. The imprisonment has ceased to be coercive and has become punitive. *See* Goldfarb, *The Contempt Power,* 266–67 (1963); *The Coercive Function of Civil Contempt,* 33 U.Chi.L. Rev. 120 (1965). As punishment, a three year confinement without possibility of bail, well may run afoul of both the prohibition in the Eighth Amendment against cruel and unusual punishment and the Fifth Amendment requirement of due process." (footnote omitted)

*Hearings,* at 463.

Senator Blakey, in response, said it was his understanding that under *Shillitani v. United States,* 384 U.S. 364, 371, n. 8, 86 S.Ct. 1531, 16 L.Ed.2d 622 (not "n.A" as text of *Hearing* indicates), a witness could be indefinitely confined for refusing to testify. Spieser replied that if that was the law, then he felt it ought to be changed because "[i]t seems clear that after a certain period of time [the witness is] going to continue to refuse [to testify]. There is no reason to compound the punishment . ." *Hearings,* at 484. *See also* 33 U.Chi.Law Rev., *supra,* at 132.

The criticisms outlined here were persuasive in the Judiciary Committee for on December 18, 1969 S. 30 was reported favorably with an amendment to § 301 which gave effect to them and embodied the current language of § 1826(a), most notably the eighteen (18)-month limitation. 116 Cong.Rec. 578 (1970) Senator Young applauded the eighteen (18)-month limit for the reasons stated by Mr. Spieser, *Id.,* at 853; *See, Id.,* at 35,196 and 35,212, and on January 23, S. 30, as amended, passed the Senate by a vote of 73–26 (with one abstention) *Id.,* at 972.

In the House of Representatives the eighteen (18)-month limit passed extensive debate with little discussion, excepting Representative Poff's comment that the limit was in keeping with the civil, non-punitive nature of the contempt. 116 Cong.Rec. 35291–2 (1970)

The foregoing discussion illustrates that though Congress considered the relationship of the civil contempt to the extension of the grand jury term to thirty-six (36) months and approved the successive impositions of civil contempt, it never addressed the precise issue at hand. However, the concerns expressed with the duration of confinement lead me to conclude that in no circumstances should a witness serve more than eighteen (18) months for refusing to testify, regardless of how many grand juries are involved. After eighteen (18) months, detention is punitive and should be attended with due process protection. I also note that the overall eighteen (18)-month limit in no way restricts the Government from successively incarcerating recalcitrant witnesses. But at some point the balance must be struck between society's need for testimony and an individual's liberty. Congress has struck the balance and I will not disturb it. To accept the Government's view would, as Andrews suggests, allow a witness to be imprisoned indefinitely by empanelling successive grand juries. This would be contrary to the statute, contrary to fundamental principles of justice, and contrary to precedent. *See In Re Cueto,* 443 F.Supp. 857, 861, 865 (S.D.N.Y.1978)

▪ The Government argues that to adopt the eighteen (18)-month limit would be to accept an unconstitutional congressional limit on the Court's inherent power to enforce its own orders. However, I need not face that question because I would not order confinement after eighteen (18) months in any event. And, the Government surely does not suggest that the grand jury's right to testimony overrides the Fifth and Eighth Amendments. *In Re Brogna,* 589 F.2d 24, 27 (1st Cir. 1978) Moreover, the statute seems clearly to contemplate some limits on the Court's power for it is clear that although a grand jury may confine a witness for eighteen (18) months, after that he must go free even if the grand jury still desires his testimony. *United States v. Mitchell,* 556 F.2d 371 (6th Cir. 1977)

## THE WITNESS' RELEASE DATE

■ The foregoing holding does not necessarily mean that Andrews must be released on April 23, 1979. Until now this discussion has centered on the coercive function of incarceration as a *limit* on the grand jury's power. However, it also has an *affirmative* aspect. That is, the grand jury does have the right to apply eighteen (18) months of coercion to the witness. From this it could be argued that the first fourteen (14) months and ten (10) days of Andrews' contempt sentence (October 12, 1977 through December 22, 1978), which were served concurrently with the state sentence, should not be applied to the eighteen (18)-month limit because that time really had no coercive impact on the witness. This kind of reasoning is especially appealing because, as federal judges are not empowered to interrupt ongoing state sentences for § 1826 contempt, *note* 1, *supra*, witnesses serving state sentences are otherwise immune from § 1826. See *In Re Liberatore, supra,* at 86. However, I decline to adopt that position because it would amount to an after-the-fact increase in the sentence imposed in October of 1977 and would work a basic unfairness on the witness who may have relied on the concurrent nature of his first sentence. I must confess that I do not know why I imposed a concurrent sentence in a case where in practice this nullified its effect.[3] However, having done so, I must live by that decision.

## CONCLUSION

In accordance with this opinion, I am issuing an Order denying Andrews' motion to vacate the contempt order of January 3, 1979, and granting his motion to modify that order to state that in no event shall he remain in custody past April 23, 1979. At that time he will have spent eighteen (18) months under sentence for refusing to testify as to the alleged bombing of an automobile owned by one Richard Fitzsimmons.

**3.** Query also, why did the Government not request consecutive sentencing or, in the alternative, criminal sanctions under 18 U.S.C.

§ 401(3) (the procedure suggested in *In Re Liberatore, supra,* at 88 and *n.* 9).