Maurice D. TAYLOR, Appellant,

v.

UNITED STATES, Appellee.

Nos. 96–CO–1175, 98–CO–633.

District of Columbia Court of Appeals.

Argued Jan. 13, 2000.
Decided Sept. 21, 2000.

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Stephen J. Gripkey, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, John R. Fisher, Mary Patrice Brown, Heidi M. Pasichow, and David L. Smith, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, RUIZ, and REID, Associate Judges.

RUIZ, Associate Judge:

This case, concerning the tape recording of the armed robbery of a police officer during an undercover drug operation, is before us a third time. In *Taylor v. United States*, 601 A.2d 1060 (D.C.1991) (*Taylor I* ), we held that the trial court abused its discretion by disallowing appellant, Maurice Taylor, to present a voice exemplar as demonstrative evidence to rebut that it was his voice on a police recording of the robbery without also taking the stand and submitting to cross-examination. *Id.* at 1066. On remand from our decision in *Taylor I*, the trial court ruled that the proposed comparison of the voice exemplar appellant had proffered at trial with the police tape recording was not minimally reliable and therefore inadmissible as evidence. *See Taylor v. United States*, 661 A.2d 636, 639 (D.C.1995) (*Taylor II* ). We affirmed the trial court's finding as to the unreliability of the live voice to tape comparison, but concluded that the trial court had abused its discretion by limiting its inquiry to only one exemplar format, when appellant had also proffered a tape-to-tape comparison. On remand from our decision in *Taylor II*, the trial court ruled that appellant's proffered exemplar of his taped voice for the purpose of comparison with the police tape—a tape-to-tape comparison—also would not be permitted because of the unreliability of the police tape for such purpose. Based on the evidentiary finding by the trial court that the police tape was unreliable, appellant filed a motion for new trial in which the police tape, which had been admitted as part of the government's case, would be excluded altogether. Appellant appeals the trial court's denial of that motion. Because we conclude that the government did not use the police tape for the same purpose for which the defense sought to introduce it, and the

defense does not otherwise challenge the admission of the police tape, we affirm.

I.

This case arises out of an undercover police operation on July 11, 1989. Taylor was convicted of robbing Officer Dean Welch, a Metropolitan Police Department officer, at gunpoint, in the course of the officer's attempt to buy drugs from Taylor and several other individuals. *See Taylor I*, 601 A.2d at 1062.[1] During the robbery a recording device in Officer Welch's car recorded the encounter.[2] *See id.* At trial, Officer Welch recounted the robbery and identified Taylor as the gunman. The tape recording of the robbery was played for the jury. As the tape played, Officer Welch, who had prepared a transcript of the recording, identified the speakers and described their various actions. Officer Welch's in-court identification of Taylor, as well as the tape recording, figured prominently in the government's case against Taylor. *See id.* at 1065–66. Taylor defended on the ground that he was not present during the drug sale and robbery, and, therefore, the voice on the tape was not his. *See id.* at 1066. To support his defense, Taylor sought to present a live sample of his voice for the jurors to compare with the tape and decide if the voice on the tape was indeed his. *See id.* at 1066. The trial court rejected the proposed comparison on the grounds that Taylor's live voice exemplar would have been testimonial evidence and could be presented only if Taylor was willing to testify on the stand, under oath and subject to cross examination. *See id.* at 1061. Taylor chose not to testify. He was convicted of one count of armed robbery and sentenced to fifteen to forty-five years in prison. *See Taylor II*, 661 A.2d at 639.

In *Taylor I*, we held that the trial court had erred by excluding the proffered live voice exemplar on the ground that it was

---

1. Taylor was tried with two co-defendants, James Shorter and Isaiah Lawrence.

2. The facts of the robbery are fully set forth in *Taylor I*, 601 A.2d at 1062.

testimonial, rather than demonstrative, evidence and remanded for the trial court to properly consider the admissibility of the proffered exemplar.[3] *See id.* at 1067. On remand, the trial court limited its inquiry to the live voice exemplar format rejected at trial and found that the voice-to-tape comparison would not meet the minimally reliable standard required for admission as evidence. *See Taylor II,* 661 A.2d at 639. In *Taylor II,* we affirmed the trial court's ruling that the voice-to-tape exemplar was not admissible but held that Taylor had intended to proffer an alternative exemplar format, a tape recording of his voice to be compared to the original police tape recording. *See id.* at 648. We therefore remanded the case for the trial court's consideration of the reliability of the tape-to-tape comparison with the following instructions:

> If the trial court finds that this format would permit a reliable comparison with the tape of the robbery, it must grant appellant a new trial. If, however, the trial court finds that the tape-to-tape comparison would not be minimally reliable and therefore could not properly be admitted in evidence, appellant's conviction will stand affirmed, subject to his right to appeal the trial court's ruling.

*Id.*

After our remand in *Taylor II,* the trial court held a hearing in which each side presented expert testimony to support their respective positions concerning the admissibility of the proposed tape-to-tape comparison. Professor Daniel Craig O'Connell, a psycholinguistics expert, testified on behalf of Taylor that the tape made at the scene of the robbery was a "low quality tape"and that a comparison would be "very difficult ... because of the tape quality," but that the original police tape and the proffered exemplar of Taylor's voice "retain sufficient voice qualities for a jury to make [a] judgment" if given an opportunity to hear the tapes with sufficient repetition. However, in response to the question whether a jury's level of attention and focus can adjust for the complexity of the comparison, Professor O'Connell testified, "I think it would be foolhearty (sic) to submit the tapes to the jury."

The government's expert, Bruce Koenig, a private consultant whose work involves analyzing audio and visual recordings, testified to extensive experience with voice comparison in a criminal context.[4] Koenig testified that the appropriate comparison process is to "look at the unknown [in this case, the police tape] to see if it is really a good enough quality to even do anything ... then you look at the exemplar to see if it [is] good enough quality and I mean quality in the sense of recording quality, voice quality, the number of words said, how they were said. All the things you need to make a comparison." Koenig testified that the proposed exemplar tape provided by Taylor would not meet the standards promulgated by the International Association for Identification or Journal of Forensic Identification; the exemplar was not made under the same conditions as the original and possessed different noise quality and background noise, different tape speeds and frequencies. Based on his review of the proposed exemplar, Koenig concluded that one could "flip a coin and

3. The government argued that excluding the voice exemplar was harmless. We concluded that "exclusion of the exemplar—if improper—would not have been harmless error.... Given the importance to the government's case of the recording and Welch's identification, we cannot hold with firm assurance that an opportunity to compare Taylor's voice with the voice on the recording would have had no effect on the jury's decision." *Taylor I,* 601 A.2d at 1066. We instructed the trial court to order a new trial if it concluded the voice exemplar should have been admitted.

4. Koenig had recently retired after over 20 years of service from his position as a senior audio examiner with the Federal Bureau of Investigation's engineering group. Koenig chaired the committee of the International Association for Identification that drafted the standards used in the field of forensic voice identification.

probably be more accurate than what the jury would with these particular samples." The trial court *sua sponte* asked Koenig: "In reference to the unknown in this case, what was the quality of that tape for comparison purposes?" During the ensuing colloquy Koenig stated that "[t]he recording quality itself [of the police tape of the robbery] even though it is certainly sufficient for intelligibility, is not very good for voice identification."

After considering the expert testimony and reviewing the tapes, the trial court concluded that the tape-to-tape format proposed by Taylor did not meet the minimally reliable standard required for admissibility of the exemplar for comparison with the police tape. *See Taylor II*, 661 A.2d at 648. The court reasoned that "[b]ecause the tapes are so different and therefore likely to mislead a layperson to conclude that the voice of the speakers is not the same, even if they are the same, the tape-to-tape comparison would be irrelevant on the question of who is the speaker on the tape that was recorded at the time the crime was being committed." The trial court further reasoned, agreeing with the government's expert, that "the quality of the tape that was recorded during the offense is of such poor quality that the court is compelled to agree with the government's expert's conclusion that it is inadequate for comparison purposes ... [and] any attempt to compare it with the known tape recorded voice of the defendant would be meaningless."

Based upon the trial court's decision and "pursuant to the remand order of the Court of Appeals in [*Taylor II* ]," Taylor filed a motion for new trial which argued that the trial court had determined that the tape of the robbery was of such poor quality that any voice identification made from the tape would lack the minimal reliability required for the admission of such evidence. Taylor claimed that the government had introduced just such a voice identification by Officer Welch at trial. According to the motion, a new trial should be granted because "[i]f evidence is unreliable for the defense, surely it is equally unreliable for the government." [*Id.*] The court denied Taylor's motion for new trial, deeming it a collateral attack on his conviction and holding that Taylor failed to meet the "cause and prejudice" standard set forth in *Head v. United States*, 489 A.2d 450, 451 (D.C.1985). Additionally, reaching the merits despite its holding pursuant to *Head,* the court noted that the government had not used the tape recording as an identification procedure, but only as proof that the robbery occurred, and that "the defendant apparently misconstrues the purpose for which the evidence was admissible." According to the trial court:

> Although the robbery victim said that the voice on the tape recording was the defendant's voice, that can hardly be said to amount to an identification of the defendant. And although the Court of Appeals referenced what the victim said about the voice on the audio recording when it discussed the strength of the government's identification evidence, the essence of the Court of Appeals' conclusion about the strength of the victim's identification related to his visual observations, his description of the robber and his subsequent visual identifications of the defendant.
>
> ... There was no comparison for identification purposes conducted in the jury's presence, or testimony that a comparison was conducted outside of the jury's presence. Moreover, the defendant did not testify during the trial; accordingly, the jury never heard the defendant speak. Therefore, there was no basis upon which the jury could have factored the victim's reference to the voice on the audio tape into its analysis of whether the government proved that the defendant was the robber.

The trial court then held that the tape was properly admitted as relevant evidence which provided "corroborative proof that the robbery occurred." [*Id.*]

## II.

### A. Minimal Reliability of Tape–to–Tape Comparison

■ As we recognized in *Taylor II*, "[b]ecause of the persuasive power of [demonstrative] evidence, however, courts are obligated to make a thorough foundational inquiry into its reliability" before admitting it, given the potential it may "mislead, confuse, divert or otherwise prejudice the purposes of the trial" if not reliable. 661 A.2d at 643. (internal quotation omitted). Such an inquiry is especially needed of a voice exemplar, which is "relatively easy to feign" because "a defendant can alter the sound of his or her voice" with relative ease. *Id.* In *Taylor II*, we adopted the following test to determine the admissibility of experimental evidence, of which comparison of a taped voice exemplar with a previous recording is a form:

[T]he foundation for admissibility should be scrutinized closely to determine whether the conditions surrounding the experiment were substantially similar to those of the alleged occurrence.

In applying the test of substantial similarity, the trial court should be guided by the following principles: Are the dissimilarities likely to distort the results of the experiment to the degree that the evidence is not relevant? Can the dissimilarities be adjusted for or explained so that their effect on the results of the experiment can be understood by the jury? In this connection the court must consider the purpose of the experiment and the degree to which the matter under experiment is a subject of precise science. Absolute certainty is not required if the experiment would be considered valid by persons skilled or knowledgeable in the field which the experiment concerns.

*Taylor II*, 661 A.2d at 643–44 (quoting *Love v. State*, 457 P.2d 622, 628 (Alaska 1969)). On remand, the trial court applied this approach, finding that the proposed tape-to-tape comparison was not minimally reliable for submission to the jury for the following reasons:

First, the circumstances surrounding the recording of the two tapes were totally different and as a result of those differences, two very distinctive sounding tapes have been produced. Second, the court credits the government expert's testimony that the tape produced at the time of the offense that any attempt to compare it with the known tape recorded voice of the defendant would be meaningless. Third, the dissimilarities between the two tapes cannot be adjusted or explained so that a comparison of the tapes will render a reliable result.

The trial court's findings were firmly grounded in the testimony of the government's expert and the trial court's own review of the respective tapes, and, notably, Taylor does not challenge this finding on appeal. Because it would not have been proper to admit the tape-to-tape comparison into evidence, we are not bound by *Taylor I*, wherein we held that "the exclusion of the [proffered] exemplar-*if improper*-would not have been harmless error" under either *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), or *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See* 601 A.2d at 1066. Rather, in both *Taylor I* and *Taylor II*, we held that if the proposed comparisons were found not to be minimally reliable, Taylor's conviction would stand affirmed. *See Taylor II*, 661 A.2d at 648 ("If ... the trial court finds that the tape-to-tape comparison would not be minimally reliable and therefore could not properly be admitted in evidence, [Taylor's] conviction will stand affirmed, subject to his right to appeal the trial court's ruling."); *Taylor I*, 601 A.2d at 1067 ("If, after considering the appropriate factors, the judge ... adheres to his decision excluding the demonstration, appellant's conviction shall stand affirmed subject to the right to appeal the trial court's ruling."). Absent other error, then, we will affirm Taylor's conviction.

## B. Voice Identification

Rather than challenge the trial court's finding that a tape-to-tape comparison would not be minimally reliable, Taylor embraces what he interprets the trial court to have held, that the police tape is of such poor quality that *any* voice identification from that tape would lack minimum reliability. Taylor argues that it is fundamentally unfair to preclude him from introducing voice identification evidence (in the form of a live voice exemplar or a tape-to-tape comparison) on the ground that it lacks minimum reliability, yet allow the government to rely on the police tape to support his conviction. As a preliminary matter it is necessary to consider whether this appeal is properly before us.

### 1. Timeliness of Taylor's New Trial Motion

In *Taylor II*, we confined the proceedings on remand to a single issue: whether Taylor's proposed tape-to-tape comparison was minimally reliable and therefore admissible. If the trial court found the tape-to-tape comparison "minimally reliable," it was to order a new trial; if not, appellant's conviction would stand affirmed. *See* 661 A.2d at 648. Taylor describes his appeal as being from a new trial motion pursuant to this court's remand order in *Taylor II;* the government argues that Taylor's claim is procedurally barred as beyond the scope of the remand order and as an untimely motion for new trial under Super. Ct.Crim. R. 33.

■ Taylor filed his motion for a new trial more than seven years after the verdict and fourteen months after the trial court's decision on the second remand. A new trial motion based on grounds other than newly discovered evidence "shall be made within 7 days after verdict or finding of guilty...." Super. Ct.Crim. R. 33 (2000). At the relevant time, a new trial motion based on newly discovered evi-

dence had to be filed "only before or within two years after the verdict or finding of guilty." Super. Ct.Crim. R. 33 (1999).[5] The time periods for filing the new trial motion are jurisdictional; this court has no power to consider an untimely new trial motion, even if the result seems harsh and it is difficult to see how the alleged newly discovered evidence would have been available within the jurisdictional period. *See Diamen v. United States,* 725 A.2d 501, 506 (D.C.1999) (citation omitted). Thus, if Taylor's motion for a new trial is pursuant to Rule 33, as the government argues, then it is barred as untimely.

■ We disagree with the government, however, that Taylor's motion is for a new trial pursuant to Super. Ct.Crim. R. 33, whether based on newly discovered evidence or otherwise. Rather, despite Taylor's own representation to the contrary, we understand Taylor's motion to be before the court pursuant to D.C.Code § 23–110, a motion which may be made "at any time." D.C.Code § 23–110(b)(20002). The nature of a motion is determined by the relief sought and not by its caption or what a party represents the motion to be. *See Diamen,* 725 A.2d at 506; *Vincent v. Anderson,* 621 A.2d 367, 370–71 (D.C.1993) (nature of a motion is determined by the relief sought, not by its caption). Taylor's is a collateral attack on his conviction based on the trial court's unexpected finding, on second remand, that the quality of the police tape was so poor that no identification from the tape would be reliable. Taylor argues that because he has been denied the opportunity to use the police tape in comparison with an exemplar of his voice to show that the voice of the robber on the tape was not his, evidentiary parity requires that the government not have been able to use the tape recording to identify Taylor at trial.

That Taylor's motion is pursuant to § 23–110, however, does not necessarily mean that the motion is properly before

---

5. Rule 33 was subsequently amended to provide a three-year period for filing of new trial motions based on newly discovered evidence. Super. Ct.Crim. R. 33 (2000).

this court for review. "Relief under § 23–110 is appropriate only for serious defects in the trial which were not correctable on direct appeal or which appellant was prevented by exceptional circumstances from raising on direct appeal." *Head,* 489 A.2d at 451. "Where a defendant has failed to raise an available challenge to his conviction on direct appeal, he may not raise that issue on collateral attack unless he shows both cause and prejudice as a result of his failure." *Id.* The trial court ruled that Taylor failed to show the requisite cause and prejudice for his failure to have raised this issue in his two prior appeals. We agree that Taylor could have objected to the admission of the tape at trial, and he candidly admits he could have, but chose not to do so because he believed the police tape was reliable for identification purposes. However, after two remands from this court, the trial court found that the police tape was not reliable for voice identification. Accepting, as he must, the trial court's finding, Taylor's argument is that the same ruling of inadmissibility of the police tape that has been applied against him should similarly have been applied to the prosecution. As this argument was not available until the trial court's order after the second remand, we believe Taylor has demonstrated just cause for his failure to raise it heretofore. Likewise, Taylor adequately demonstrates prejudice. If the government was able to use evidence at trial for a certain purpose, Taylor also should have been able to use the same evidence for the same purpose. *Cf. Spencer v. United States,* 688 A.2d 412, 419 (D.C.1997) ("Having permitted the prosecutor to ask the expert whether certain facts were consistent with guilt, [the trial court] could not then refuse to allow defense counsel to ask whether the same facts were consistent with innocence."). Accordingly, we will reach the merits of Taylor's claim.

## B. Merits of Taylor's New Trial Motion

■ Taylor's § 23–110 claim must rise or fall on his assertion that there was evidentiary disparity, which is premised on the assertion that the government used the tape recording for an in-court voice identification of Taylor at trial. The trial court rejected this argument in no uncertain terms: "[T]he defendant has sought to characterize the government's use of the tape recording as an identification procedure ... To suggest that the jury used the audio tape evidence under the circumstances of its admission as proof of the defendant's identification as the robber is to insult the intelligence of the jury." We agree with the trial court that at trial the government did not use the tape recording to make a voice identification of Taylor. Rather, the tape recording was a re-broadcast, with the actual voices of the various players, of a series of events that Officer Welch had already described to the jury in exacting detail, after he had identified Taylor at trial from their face-to-face encounter during the robbery.[6]

Prior to the tape of the robbery being played for the jury, Officer Welch recounted at length, step by step, his encounter with Taylor and Taylor's co-defendants on the night of the robbery, describing the entire scene, the parties' various movements, and the role each played. During the course of this testimony, Officer Welch described the gunman's appearance on the night of the robbery, his movements during the incident, and made an in-court identification of Taylor as the gunman; the officer did the same for Taylor's co-defendants, describing their various roles and making in-court identifications of each co-defendant. Only after Officer Welch had thus testified was the tape played. The jury was given a transcript of the recording prepared by the officer to aid them in following who was speaking at each moment. As the tape played, Officer Welch described the parties' various movements

---

**6.** Prior to the tape being played the court recognized that Officer Welch had already identified Taylor: "Well, he's already testified that the person he saw was Taylor."

in relation to what was being said by the participants:

Q. What's happening here?

A. Mr. Taylor's coming up to the passenger side window and he's asking if I want a bottle and we're telling him we want three bottles.

Q. And where is [co-defendant] Lawrence at that time?

A. Sitting directly beside me on the passenger seat.

Q. Was this after he motioned to Mr. Taylor or before?

A. After. Mr. Taylor had already come to the car.

. . . .

Q. What's going on here?

A. Now, Mr. Taylor is asking if I'm going to check or test the liquid PCP.

. . . .

Q. Now, what's going on here?

A. Mr. Taylor has come back to the car. He's sitting in the passenger seat and [co-defendant] Shorter's standing by the driver's window.

. . . .

Q. What's going on here?

A. Now, I know I'm in trouble. Mr. Taylor has just ran all the way down the street, came back, sweating. He said he's got all three ounces. He's trying to get me to but [co-defendant] Shorter's—

. . . .

Q. What were you thinking, when, at this point, Mr. Taylor is saying, "You're trying to by, you trying to buy then but it from him?"

A. I can't figure him out. Now I'm trying to get him out of the car.

. . . .

Q. What were you trying to do?

A. In my experience, I know that I should get one of them out of the way, so I only have to deal with one. And at that point I didn't trust Mr.

Taylor. I wanted to get him out of the car.

. . . .

A. At that point Mr. Taylor reached for the door, as if he was going to get out, and came back around with the gun in his hand. If you could play it back just a little bit.

Q. For what purpose?

A. There's a distinct noise on there. It's two clicking sounds, just the click of the hammer coming back on the gun.

As the foregoing testimony makes clear, Officer Welch identified the voice on the tape as Taylor's from what the various actors on the tape were saying and doing, but did not identify Taylor as the robber from the voice on the tape. This is a crucial distinction that is fatal to appellant's case. Because the government did not use the police tape to identify Taylor from his voice, the court's evidentiary ruling excluding a tape-to-tape comparison using the police tape to impeach the officer's identification did not offend the rule of parity.

Taylor argues that we are precluded from so holding because, according to Taylor, in both *Taylor I* and *II* we recognized that the officer identified Taylor from the voice on the tape and rejected the argument that the officer's identification of Taylor's voice on the tape was unimportant to the government's case. In *Taylor I*, we stated that "Welch identified Taylor's voice on the tape as that of the gunman in the robbery," 601 A.2d at 1066, which is consistent with what we herein describe. We also noted in *Taylor I* "the importance to the government's case of the recording and Welch's identification," *id.*, and in the facts section of *Taylor II* related that "the tape of the robber's voice, as well as Officer Welch's in-court identification of that voice as appellant's, figured prominently in the government's case." 661 A.2d at 640. Our holding today that the officer did not identify Taylor from the robber's voice on the tape is consistent with these prior

statements from *Taylor I* and *Taylor II*: the tape was important to the government's case as powerful corroborating evidence that the robbery occurred as he described it, as was Officer Welch's identification of Taylor as the gunman based on their personal encounter during the robbery. We recognized in *Taylor I* that an opportunity to present evidence that Taylor's voice was not on the tape could have had an effect on the jury's decision by calling Welch's in-court identification of Taylor into question. *See* 601 A.2d at 1066. As we have concluded, however, the trial court properly denied Taylor that opportunity, a finding Taylor does not appeal. Because exclusion of the proffered tape-to-tape comparison was proper, and because we perceive no disparity in the trial court's evidentiary rulings, Taylor's conviction is

*Affirmed.*